**NOT RECOMMENDED FOR PUBLICATION**
File Name: 16a0037n.06

**Nos. 14-1693/2488**

| | | |
|---|---|---|
| **UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT** | | **FILED**<br>Jan 22, 2016<br>DEBORAH S. HUNT, Clerk |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| RICHARD DEAN WOOLSEY, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

**BEFORE:** **BATCHELDER and GRIFFIN, Circuit Judges; and CARR, District Judge.**[*]

**ALICE M. BATCHELDER, Circuit Judge.** A jury convicted Richard Woolsey of one count of Conspiracy to Commit Mail and Wire Fraud and one count of Aiding and Abetting Wire Fraud. The district court ordered Woolsey to pay $6,167,230.83 in restitution and sentenced him to ninety months of imprisonment followed by three years of supervised release. Woolsey appeals the district court's calculation of both the restitution amount and the applicable sentencing guideline range. We affirm.

## I. Background

### A. The Scheme

Sometime around 2006, Woolsey devised a plan to fraudulently buy sixteen cabins in Sevierville, Tennessee, for use as vacation rentals. The scheme worked as follows. Woolsey

---

[*] The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

recruited straw buyers from among friends and family, including co-defendant Ryan Vinco (who is not a party to this appeal), marketing the properties as investment opportunities. He managed to set the purchase prices for these cabins higher than the sellers had agreed to accept, funneling the excess (about $150,000 per cabin) to the real estate company that he owned in the form of commissions. Unbeknownst to the lenders, Woolsey, not the straw buyers, provided the money for the down payments and used rental income from the properties as well as money from the commissions to make the mortgage payments.

Woolsey overestimated the demand for these rentals, however, and it soon became evident that the rental income and commissions were going to be insufficient to keep up with the mortgage payments. To cover the shortfall, Woolsey decided to buy up homes in southeastern Michigan in order to flip them for a profit or to refinance them.

Woolsey and Vinco purchased dozens of homes in Michigan using a straw buyer ploy similar to the one used to buy the Tennessee cabins. These purchases involved $2,500 payments to the straw buyers in exchange for their names and credit. As in Tennessee, the straw buyers did not pay the down payments and did not expect to pay the mortgages. Woolsey would then sell the properties and include large commissions to his real estate company, which he used to pay off the Tennessee mortgages and to help fund down payments for straw buyers.

The Michigan houses, however, failed to provide the necessary cash, and Woolsey and Vinco decided to make a last-ditch effort to keep up with the mounting mortgage obligations. Woolsey acted as straw buyer for a property in Northville, Michigan (the Clover Hill property). He applied for an $880,000 loan, stating, falsely, that he intended to live in the house. An appraiser who worked for Woolsey then appraised the Clover Hill property at $1.1 million. In fact, the Clover Hill property was worth only about $663,000. Woolsey convinced the seller to

accept $610,000 for the house, and the excess loan money went to Woolsey's real estate business as a commission.

Woolsey made only two payments on the mortgage, and the lender eventually foreclosed. Woolsey was indicted and convicted on charges of Conspiracy to Commit Mail and Wire Fraud and of Aiding and Abetting Wire Fraud.

## B. Sentencing

Following Woolsey's convictions, the probation department recommended a sentencing range of 168–210 months based on a loss amount of at least $11 million. Woolsey submitted his own calculation, ostensibly to point out the errors in the government's proposed loss amount, which put the losses at roughly $2,750,000. At the sentencing hearing, the district court accepted Woolsey's lower number and reduced the guidelines range to 97–121 months. After explaining its calculation, the district court asked if "anyone ha[d] any objection . . . to anything I have said." The government responded that it did not. And defense counsel stated that, "as far as the advisory guidelines, I would concur . . . . I would concur with the guideline range at this point, your honor." The district court varied downward from the guideline range and sentenced Woolsey to ninety months of imprisonment followed by three years of supervised release.

With regard to restitution, the government initially estimated the loss at $11 million. It based this determination on evidence and testimony at trial as well as from investigative subpoenas, payment histories, and public records. Woolsey disputed this amount, and the government revised its estimate by disregarding every property that Woolsey had said that he was not involved with, giving him credit for every payment he claimed to have made, and correcting the mortgage amounts he disputed. It then reduced the loss by the resale price of each piece of property. Thus, for example, it concluded that the lender on the Clover Hill property

lost $488,000 using the following calculation: Mortgage ($880,000) – Mortgage Payments Made ($17,000) – Resale Price ($375,000).  The district court accepted the government's approach and ordered Woolsey to pay $6,167,230.83 in restitution.

## II. Analysis

### A. Restitution

When considering fraud schemes such as this one, the sentencing court may order restitution to all of the victims of a defendant's scheme, "even when the defendant was not indicted or convicted of fraud with respect to each victim."  *United States v. Jones*, 641 F.3d 706, 714 (6th Cir. 2011); *accord* 18 U.S.C. § 3663A(a)(2).  This applies only insofar as the "loss is attributable to the *precise scheme* that was an element of the defendant's convicted offense."  *Jones*, 641 F.3d at 714 (emphasis added).  When, as here, "a defendant is convicted by a jury . . . the scope of the scheme is defined by the indictment."  *Id.*  The indictment in this case alleged that Woolsey engaged in fraud by providing false and inflated appraisals, disguising the source of down payments, providing false income information for straw buyers, providing false bank account balances, falsely stating that the buyers would use the property as primary residences, and concealing the fraud by making mortgage payments on the properties.  Woolsey argues that the government failed to prove that the scheme extended beyond the Clover Hill purchase to the other properties in Michigan and Tennessee.

We review *de novo* whether a restitution order is permitted under law.  *United States v. Batti*, 631 F.3d 371, 379 (6th Cir. 2011).  If it is, the amount of restitution is reviewed for an abuse of discretion.  *Id.*

Woolsey is correct that not *every* piece of property was purchased using *all* of the fraudulent methods employed by Woolsey and Vinco. But there is ample reason to think that

both the Clover Hill property and the other properties were all part of a single scheme: Woolsey and Vinco consistently employed straw buyers, they concealed from lenders that the straw buyers would not be paying the down payments or mortgages, and they saw to it that Woolsey's real estate business received very large commissions. The Michigan purchases, moreover, were a continuation of the Tennessee scheme, used in order to get the cash necessary to make mortgage payments on the Tennessee properties.

Woolsey contends that, even if these transactions were part of the same scheme, the government failed to prove the loss amount. This argument too lacks merit. Woolsey is correct that there were no loss letters from the lenders and that two of the government's witnesses testified at trial that they did not know exactly how much the bank had lost on the Clover Hill property. Such information, especially loss letters, might have been helpful, but Woolsey cites no authority suggesting that such loss letters are required or that the government's witnesses had to know at trial precisely how much a lender lost on a particular property. The method used by the district court was reasonable and does not support a finding that it abused its discretion.

## B. Guidelines

Woolsey also argues that the district court's sentencing guideline determination was based on an erroneous loss calculation and on the unjustified conclusion that the fraud affected ten or more victims. Woolsey's trial counsel, however, waived any challenge to the district court's guideline calculation by agreeing with that calculation at the hearing. "An attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course." *United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002) (alterations and internal quotation marks omitted); *accord United States v. Olano*, 507 U.S. 725, 733–34 (1993).

Sensing that his arguments regarding district court's guideline calculation were doomed, Woolsey also argues in his reply brief that his trial lawyer's failure to object denied him effective assistance of counsel at sentencing. This point is not well taken. To begin with, habeas corpus review, not direct appeal, "is the preferred mode for raising a claim of ineffective assistance of counsel." *United States v. Ferguson*, 669 F.3d 756, 762 (6th Cir. 2012). More fundamentally, relief on this issue is foreclosed on direct appeal because it is raised for the first time in a reply brief. *See United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002).

### III. Conclusion

For the foregoing reasons we affirm the district court's restitution order and sentencing decision.