NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 16a0497n.06

Case Nos. 15-1661/1849

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | Aug 23, 2016 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
|  | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
|  | ) | THE WESTERN DISTRICT OF |
| EMAD KHALIL KARAEIN; JAWAD | ) | MICHIGAN |
| KHALIL-AMHAD KARAEIN, | ) |  |
|  | ) |  |
| Defendants-Appellants. | ) | OPINION |
|  | ) |  |

BEFORE: GIBBONS, GRIFFIN, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** Appellants Emad Karaein ("E. Karaein") and Jawad Karaein ("J. Karaein") are brothers who operated a grocery store that illegally profited by allowing its patrons to redeem food stamp and Woman, Infants, and Children ("WIC") benefits for ineligible items. Eventually, the scheme caught up with the Karaein brothers when a grand jury returned a four-count indictment against them for (1) conspiracy to defraud the United States, (2) food stamp fraud, (3) WIC fraud, and (4) making a false statement to a representative of the United States. The Karaein brothers pleaded guilty to committing WIC fraud, in violation of 42 U.S.C. § 1760(g), and the district court sentenced E. Karaein to thirty-four months of imprisonment and ordered him to pay $1,271,983 in restitution and J. Karaein to thirty months of imprisonment and ordered him to pay $1,294,078 in

restitution. Although they entered into a plea agreement, the brothers appealed, contending that the district court erred in two of its factual findings for sentencing purposes. Both brothers dispute the district court's decision to calculate the total amount of the loss from 2001, as opposed to 2006. Additionally, J. Karaein takes issue with the district court's finding that he was an owner, as opposed to an employee, of the grocery store. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

I.

The Karaein brothers operated Middle Eastern Market ("MEM"), a neighborhood grocery store in Grand Rapids, Michigan. MEM opened in 2001 and was quickly authorized to accept food stamp benefits on May 3, 2001. In December 2001, MEM was also authorized to accept WIC benefits.

Sometime in January 2009, the United States Department of Agriculture ("USDA") began investigating MEM to ascertain whether it was illegally allowing its customers to exchange WIC and food stamp benefits for ineligible items, such as smoking products and cash. USDA investigators engaged in a series of undercover transactions that confirmed their suspicions. Based on those transactions, a search warrant was issued for the store on June 23, 2010. Investigators located records confirming the fraud during the search. Law enforcement officers also interviewed E. Karaein while executing the search warrant. E. Karaein signed a statement in which he admitted that beginning in late 2007 he allowed customers to "exchange their benefits for cash, tobacco pipes, tobacco, phone cards, and other non-food items." (Page ID # 464.)

The Karaein brothers pleaded guilty to committing WIC fraud, in violation of 42 U.S.C. § 1760(g). With respect to E. Karaein, the probation officer prepared a Presentence Investigation

Report ("PIR"), which identified him as the leader of the conspiracy.  (Page ID # 438.)  In the PIR, the loss attributed to E. Karaein totaled $1,272,013.88.  (Page ID # 438.)  The loss attributed to J. Karaein totaled $1,294,108.88.  (Page ID # 771.)

In calculating the loss attributable to both brothers from the fraud at MEM, the PIR utilized the post-search warrant method. (Page ID # 539.)  Under the post-search warrant method, the average of the amount of redemptions in the months following the search warrant is presumed to represent the amount of legitimate redemptions for the entire fraudulent period in question.  (Page ID # 539.)  The average monthly redemption figure is subtracted from the total redemptions per month in which the fraud occurred. (Page ID # 539.)  The PIR concluded that, based on the evidence in the case, the fraud started in May 2001.  (Page ID # 484.)  Both brothers filed a Sentencing Memorandum objecting to the PIR's calculated amount of loss.  Specifically, they objected to the fraud period beginning in May 2001 and argued that it should instead begin in 2006.  The government filed a Sentencing Memorandum supporting the PIR calculation in both cases.

On June 2, 2015, the district court held a sentencing hearing where E. Karaein reiterated his contention that the fraud calculation should begin in 2006.  USDA agent Travis Deters ("Agent Deters") testified for the government as to why the fraud calculation should begin in May 2001.  (Page ID # 678.)  Specifically, he cited the fact that approximately five months after MEM was authorized to accept food stamps, the USDA hotline received a tip alleging that MEM was allowing its customers to purchase ineligible items with their food stamp benefits.  (Page ID # 680.)  He also mentioned that during the application process, a store site survey was performed and that during the survey empty coolers were observed at MEM, which suggested that MEM lacked inventory.  (Page ID # 680.)  The lack of inventory was particularly troubling because

Karaein previously represented that he expected MEM to have annual sales of $350,000.00 per year. (Page ID # 681.) The district judge also questioned Agent Deters as to how he justified beginning the fraud period in May 2001. In response, Agent Deters referenced ledgers that were confiscated during the search of MEM to support his opinion that May 2001 was when the fraud began. (Page ID # 704.) Once transcribed, the ledgers were interpreted to reveal that Karaein took money to Jordan or to Amman Jordan as far back as 2003. This was suspect because, as Agent Deters opined, Karaein did not have the reported income to deliver money to anyone if he was not participating in the illegal scheme. (Page ID # 705.)

Ultimately, the district court decided that the fraud began in 2001. (Page ID # 710.) To arrive at that conclusion, the district court relied on the totality of the circumstances, but it specifically referenced Agent Deters' testimony and an exhibit[1] that compared MEM's monthly redemptions from May 2001–June 2010 to the average redemption of Alger International Market[2] from February 2011–August 2011. (Page ID # 709–10.) The district court sentenced E. Karaein to a below-guidelines sentence of thirty-four months of incarceration to be followed by two years of supervised release and ordered him to pay $1,271,983.00 in restitution. (Page ID # 718–19.)

At J. Karaein's sentencing hearing, since his argument regarding the start date of the fraud calculation would have been identical to that of his brother, both parties and the district court agreed to allow J. Karaein to adopt the same proof and that the issue would be fully preserved on appeal. (Page ID # 936.) However, J. Karaein contested the PIR's recommendation that he be found to have an ownership interest in the store. Whether he had an ownership interest in MEM was important because that finding would determine whether he was

---

[1] *See* Page ID # 534.
[2] Karaein sold MEM in November 2010. The new owner renamed the store Alger International Market.

obligated to report MEM's financial information on his personal application for federal subsistence benefits. If J. Karaein had an ownership interest, he defrauded the government by not reporting MEM's bank account as an asset and source of funds for his family which consequently would raise the fraud amount attributable to him.

To support its contention that J. Karaein was a part-owner of MEM the government relied upon the testimony of Agent Deters. (Page ID # 938.) Agent Deters testified that, when he asked E. Karaein was he the sole owner of MEM, E. Karaein responded that "he was a 50/50 owner with his brother, Jawad." (Page ID # 939.) Agent Deters also stated that J. Karaein was listed as a vice president on MEM's food stamp reauthorization application, the form submitted to the Michigan Department of Labor and Economic Growth, which is the document filed for corporate entities, and MEM's WIC application. (Page ID ## 939–40; 41–42.) Moreover, on a store visit, a USDA investigator referred to J. Karaein as a co-owner in his notes. (Page ID # 940.) Agent Deters opined that the USDA investigator's notes reflected that J. Karaein was a co-owner because investigators typically write down what they are told. (Page ID # 941.) Lastly, Agent Deters stated that J. Karaein was one of three signatories on MEM's bank account. (Page ID # 942.) The district court concluded that the government had established that J. Karaein was an owner and comported himself as an owner of the business and sentenced him to serve thirty months of imprisonment followed by two years of supervised release and ordered him to pay $1,294.078 in restitution. (Page ID ## 954, 955, 962.)

II.

A.

On appeal, the Karaein brothers reassert their position that the district court erred in determining that the fraud commenced in May 2001. Specifically, they contend that there were

insufficient facts to support "using the 2001 through February 2006 period." (E. Karaein Appellant Br. 11.; J. Karaein Appellant Br. 4.) For the reasons that follow, we disagree and hold that the district court did not err in deciding, for sentencing purposes, that the fraud began in May 2001.

B.

At the outset, we note that the Karaein brothers are not challenging the district court's decision to use the post-search warrant method in calculating their sentences. (*See* E. Karein Appellant Br. 10; J. Karaein Appellant Br. 5.) Rather, the sole issue on appeal is the district court's factual finding that the fraudulent scheme was initiated in May 2001. We review the findings of fact underlying the district court's loss calculation using a clearly erroneous standard. *United States v. White*, 492 F.3d 380, 414 (6th Cir. 2007). "A finding that the calculations were clearly erroneous will follow only if this Court 'on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Ware*, 282 F.3d 902, 907 (6th Cir. 2002)).

Under the United States Sentencing Guidelines, the district court "need only make a reasonable estimate of the loss." U.S.S.G. 2B1.1. cmt. 3(C). We give deference to the district court's finding because "[t]he sentencing judge is in a unique positon to assess the evidence and estimate the loss based upon that evidence." *Id.* In estimating the loss, the district court's finding must be based on "available information" and may consider "revenues generated by similar operations." *Id.* Upon review, we take no issue with the manner in which the district court concluded that the fraudulent scheme began in May 2001, as it was based on all the available and relevant information. (*See* Page ID # 709.)

Both Karaein brothers attempts to "explain away" the evidence relied upon by the district court. However, their explanations do not help their cause because the district court was free to accept or reject their spin on the available evidence. The Karaein brothers contend that Agent Deters' testimony should have no influential value because the anonymous 2001 tip that Agent Deters testified about was investigated and the case was closed with no finding of fraud. (E. Karaein Appellant Br. 21.; J. Karaein Appellant Br. 6.) However, the tip was reported to the Food and Nutrition Services' administrative arm, which is not responsible for criminal investigations. Moreover, even though at that time the fraud was not discovered, the fact that the Karaein brothers were subsequently convicted of the same conduct complained about in the 2001 tip is relevant, and the district court was well within its rights to take that into consideration.

With respect to Agent Deters' testimony regarding the empty coolers at MEM in 2001 during the spot check, the Karaein brothers contend that MEM was certified to accept food stamp and WIC benefits after that inspection; thus, the empty coolers could not be "indicative of fraud." (Page ID # 22.) As with his argument regarding the investigation, the Karaein brothers argue that we should accept their explanation. As stated above, we are foreclosed from accepting that invitation. *See* U.S.S.G. 2B1.1. cmt. 3(C). Although the district court did not expressly state how influential Agent Deters' testimony was regarding the empty coolers, it did not err in considering it in determining that the fraudulent scheme started in May 2001, as it leads to the conclusion that fraud was taking place.

Notwithstanding his argument regarding Agent Deters' testimony, E. Karaein principally contends that the exhibit comparing the difference in redemptions received by MEM from May 2001 through June 2010 to that of the average redemption received by Alger International Market should not be viewed as probative in determining the initiation date for fraud calculation

purposes.[3]  (*See* Page ID # 534–36.)  With regard to this chart, the district judge stated, "the differences are so stark . . . [that] I am convinced that the calculation starting in 2001 is justified."  (Page ID # 710.)  As with the other evidence, the district court did not err in considering the exhibit, and as a matter of fact, the applicable Sentencing Guidelines expressly authorize it to consider "revenues by similar operations."  U.S.S.G. 2B1.1. cmt. 3(C).

E. Karaein's arguments to the contrary are unavailing.  He argues that it was inappropriate to compare MEM to Alger International Market because "there was no evidence in the record about the type of business it was, or how it operated, other than it was in the same location."  (E. Karaein Appellant Br. 24.)  The fact that Alger International Market was in the same exact location but owned by a different individual provided the district court with a sufficient basis to use the exhibit, as it was at minimum a "similar operation." *See* U.S.S.G. 2B1.1. cmt. 3(C).

In the end, taking into account Agent Deters' testimony as well as the exhibit illustrating the stark contrast in the amount of redemptions MEM collected each month to that of the average monthly redemption collection of Alger International Market, we do not have a "definite and firm conviction that a mistake has been committed" in deciding that the fraud in this case began in May 2001. *Ware*, 282 F.3d at 907.

## III.

On appeal, J. Karaein also reasserts his argument that the district court erred in finding that he had an ownership interest in MEM.  (J. Karaein Appellant Br. 8.)  As that was a factual finding by the district court, we also review the district court's determination for clear error. *White*, 492 F.3d at 414.

---

[3] J. Karaein's brief does not set forth this argument.

Upon review, we hold that the district court did not err in determining that J. Karaein was a part-owner on MEM. The district court finding was based on an abundance of evidence. For instance, Agent Deters testified that J. Karaein was a signatory on MEM's bank account and that his brother and co-defendant, E. Karaein also told him that J. Karaein owned fifty percent of the store.

J. Karaein's counter arguments are unavailing. Specifically, he contends that a "vice-president, is not necessarily an owner" and points us to documents supporting his contention that he was only an employee. (J. Karaein Appellant Br. 9.) Moreover, while admitting that he was a signatory on MEM's bank account, J. Karaein argues that the account was an asset of the business and not available to him for personal use. (J. Karaein Appellant Br. 10.) But, as stated ad nauseam above, our role is to make sure that the district court's conclusion was not clearly erroneous, not to re-weigh the evidence. Accordingly, we cannot adopt J. Karaein's characterization of the evidence.

IV.

For the foregoing reasons, we **AFFIRM** the district court's judgment.

GRIFFIN, Circuit Judge, dissenting.

I respectfully dissent from the majority's implicit conclusion that the meager evidence adduced at Emad Karaein's sentencing hearing established by a preponderance of the evidence that defendants' fraud began in 2001. Thus, I would vacate defendants' sentences and remand for resentencing.

Emad and Jawad Karaein pleaded guilty to defrauding the government by allowing customers at Middle Eastern Market to exchange Women, Infants, and Children (WIC) benefits for ineligible items. At the sentencing hearing,[1] the burden was on the government to establish by a preponderance of the evidence that the fraudulent scheme began in 2001, as opposed to 2006. *United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011). In my view, having failed to produce sufficient evidence, the government did not satisfy its burden, and, accordingly, the district court clearly erred in calculating the amount of loss beginning in 2001.

Defendants' principal argument is simple: an empty fish cooler, an uncorroborated hotline tip, and Emad Karaein's so-called "unexplained wealth" are insufficient to establish that the fraud dates back to 2001. Defendants do not deny that they defrauded the government. Instead, they contest the government's claim that the fraud began in 2001, rather than 2006, as alleged in the indictment. This sentencing issue is particularly important to defendants because using 2001 as the starting date, instead of 2006, significantly increases the amount-of-loss calculation, affecting their terms of imprisonment and restitution.

We review the district court's factual findings as to the amount of loss for clear error. *Id.* (citing *United States v. Warshak*, 631 F.3d 266, 328 (6th Cir. 2010)). "An error with respect to

---

[1] The parties argued this issue at Emad Karaein's sentencing hearing. At Jawad Karaein's later sentencing hearing, the parties adopted the evidence and objections presented at Emad Karaein's sentencing hearing.

the loss calculation is a procedural infirmity that typically requires remand." *Id.* (internal quotation marks omitted).

First, the government makes much of an empty fish cooler observed during an inspection. This was the requisite USDA site inspection that Middle Eastern Market passed in the process of obtaining authorization to accept food stamps and WIC benefits. At 9:05 a.m. on April 28, 2001, a USDA inspector visited the store. The inspector recorded his observations on a USDA form: he checked "yes" to the presence of a deli, with "[p]rices posted for meats/cheeses sold by weight," wrote "store clean and organized," and checked "[p]rices [marked] on individual items." At the bottom of the form, under the heading "store conditions," the inspector checked just one box, "empty coolers." He did not check any of the following boxes: empty shelves, broken coolers, moldy coolers, dusty cans/packages, faded/missing labels, poor lighting, foul odors, dirty/unsanitary, ice crystals on frozen foods, expired/outdated foods. Nor did he check the "other" box or write anything in the corresponding blank space. In the comments section, he noted, "Fish cooler not used in morning." In other words, as explained by USDA Agent Travis Deters at defendants' sentencing hearing, it appears that the inspector observed an empty cooler, inquired as to why it was empty, and learned that it was a fish cooler that was not used at 9:05 in the morning. Shortly thereafter, the USDA authorized the store to accept food stamps and WIC benefits. That the store had a fish cooler that was not used in the mornings does not appear to have raised any red flags for the USDA.

Second, at sentencing, the government relied upon an anonymous hotline tip as evidence that defendants were engaged in WIC fraud in the fall of 2001. On September 4, 2001, an anonymous caller contacted a USDA hotline to report that the store had allowed "hot foods" and "pre-paid phone cards to be sold for food stamp benefits." No further information was provided.

This was approximately five months after the store was authorized to accept food stamp benefits. The USDA investigated. An inspector visited the store on September 10, 2001, and "did [an] inventory and brief interview" with Emad Karaein. The inspector returned on October 18, 2001, and "completed [an] interview in depth." Ultimately, the inspector concluded that the hotline "complaint [was] from [a] competitor" of the store. The inspector noted that the store would be monitored but no further action would be taken at that time.

Finally, at sentencing, the government argued that Emad Karaein's "unexplained wealth" somehow corroborated that he had defrauded the government in 2001. The basis of the government's argument was that Emad Karaein took out a mortgage of approximately $142,000 when he bought the store but paid it off quickly, perhaps two to three months later. But this "unexplained wealth" is of limited probative value as it relates to whether defendants allowed customers to illegally exchange ineligible items for food stamps or WIC benefits in 2001.[2] First, this evidence was presented as to Emad Karaein, not Jawad Karaein.[3] (This means the only evidence against Jawad Karaein is a single, empty fish cooler and an uncorroborated anonymous tip dismissed by the USDA.) Second, Agent Deters did not offer any details. For instance, he did not explain how the mortgage was paid off or when it was paid (other than approximating it was two to three months later). He could not confirm or deny whether Emad Karaein paid off the mortgage with the help of a loan from his brother, Mustafa. Third, and more importantly, using the timeline presented by Agent Deters, the mortgage pay-off probably occurred *before* the store was authorized to accept food stamps or WIC benefits. Finally, even assuming that the pay-off occurred after the store was authorized to accept benefits, a closer look at the record

---

[2] Emad Karaein does not challenge the portion of the loss amount related to his personal use of benefits for his family ($113,617).

[3] It appears from the limited evidence put on the record with respect to Emad Karaein's "unexplained wealth" that Emad Karaein, not Jawad Karaein, was the only person on the mortgage.

reveals that the store redeemed only negligible amounts in 2001 (*e.g.*, $170.99 in May 2001, $618.27 in July 2001, $489.48 in August 2001, and $48.08 in September 2001). In other words, even assuming that Emad Karaein paid his mortgage in cash without a loan from his brother *after* the store was authorized to accept food stamps or WIC benefits, the government's theory that these amounts enabled Emad Karaein to pay off a $142,000 loan is untenable.[5]

Resting on this evidence, the government argued to the district court that it should calculate the amount of loss from 2001 to 2010, as opposed to 2006 to 2010. Based on "the totality of the circumstances," and Attachment D to the government's sentencing memorandum, the district court ruled that calculating the amount of loss beginning in 2001 was "justified." However, Attachment D was a spreadsheet comparing by month Middle Eastern Market's benefits redemptions from May 2001 to June 2010 with the store's post-search warrant monthly redemption average ($5,799.31) under new management in 2011. In the final column, Attachment D estimates each month's fraud by subtracting the post-search warrant redemption average ($5,799.31) from Middle Eastern Market's monthly redemptions. Thus, the spreadsheet is a rough estimate of fraud for each month that Middle Eastern Market redeemed food stamps or WIC benefits, not proof that fraudulent redemptions began at a certain time. When the district court mentioned Attachment D as justification for calculating the amount of loss from 2001, the government asked for clarification, referring to Attachment D as "just [] a back stop and a second check on [the evidence presented by the government] . . . ." The district court clarified: "Right, for me it is part of the totality of the circumstances which convinces [me] that going back to 2001 is supported; that Agent Deters's calculation based on 2001 is supported by the totality

---

[5] Agent Deters also briefly mentioned, without detail, that Emad Karaein sent or took cash to someone in the country of Jordan in 2003. For the same reasons, this argument carries no weight with respect to store-related fraud. As to Emad Karaein's personal use of benefits ($113,617), as noted above, he does not challenge that portion of the amount of loss on appeal.

of the evidence available." But Attachment D is not probative of whether the fraud began in 2001 or 2006. Neither the government nor Agent Deters suggested that Attachment D provided a basis from which to decide the fraudulent activity started in 2001. It was not offered for that purpose. It is merely a comparison by month of the store's benefits redemptions with a 2011 post-search warrant average for purposes of totaling the amount of loss. Accordingly, the district court's reliance on it to prove that defendants engaged in fraud in 2001 was misplaced. Furthermore, that the defendants do not challenge on appeal the post-search warrant method for calculating loss does not change the fact that Attachment D is not probative of whether defendants engaged in fraud between 2001 and 2005.

What remains is an explicably empty fish cooler, an uncorroborated hotline tip that the government investigated and dismissed as made by a "competitor," and—in the case of only one of the defendants—Emad Karaein's mortgage pay-off that occurred before the store was authorized to accept benefits or shortly thereafter. This evidence falls conspicuously short of establishing by a preponderance of the evidence that defendants had engaged in fraud starting in 2001.

At sentencing, a court "may not attribute a loss to a defendant based on mere speculation." *United States v. Comer*, 93 F.3d 1271, 1285 (6th Cir. 1996). Ultimately, I am left with the "definite and firm conviction that a mistake has been committed," *id.* (quoting *United States v. Moreno*, 933 F.2d 362, 374 (6th Cir. 1991)). I would vacate defendants' sentences and remand for resentencing.