GRIFFIN, Circuit Judge,
dissenting.
I respectfully dissent from the majority’s implicit conclusion that the meager evidence adduced at Emad Karaein’s sentencing hearing established by a preponderance of the evidence that defendants’ fraud began in 2001. Thus, I would vacate defendants’ sentences and remand for re-sentencing.
Emad and Jawad Karaein pleaded guilty to defrauding the government by allowing customers at Middle Eastern Market to exchange Women, Infants, and Children (WIC) benefits for ineligible items. At the sentencing hearing,[1] the burden was on the government to establish by a preponderance of the evidence that the fraudulent scheme began in 2001, as opposed to 2006. United States v. Jones, 641 F.3d 706, 712 (6th Cir. 2011). In my view, having failed to produce sufficient evidence, the government did not satisfy its burden, and, accordingly, the district court clearly erred in calculating the amount of loss beginning in 2001.
Defendants’ principal argument is simple: an empty fish cooler, an uncorroborated hotline tip, and Emad Karaein’s so-called “unexplained wealth” are insufficient to establish that the fraud dates back to 2001. Defendants do not deny that they defrauded the government. Instead, they contest the government’s claim that the fraud began in 2001, rather than 2006, as alleged in the indictment. This sentencing issue is particularly important to defendants" because using 2001 as the starting *394 date, instead of 2006, significantly increases the amount-of-loss calculation, affecting their terms of imprisonment and restitution.
We review the district court’s factual findings as to the amount of loss for clear error. Id. (citing United States v. Warshak, 631 F.3d 266, 328 (6th Cir. 2010)). “An error with respect to the loss calculation is a procedural infirmity that typically requires remand.” Id. (internal quotation marks omitted).
First, the government makes much of an empty fish cooler observed during an inspection. This was the requisite USDA site inspection that Middle Eastern Market passed in the process of obtaining authorization to accept food stamps and WIC benefits. At 9:06 a.m. on April 28, 2001, a USDA inspector visited the store. The inspector recorded his observations on a USDA form: he checked “yes” to the presence of a deli, with “[p]rices posted for meats/cheeses sold by weight,” wrote “store clean and organized,” and checked “[p]rices [marked] on individual items.” At the bottom of the form, under the heading “store conditions,” the inspector checked just one box, “empty coolers.” He did not check any of the following boxes: empty shelves, broken coolers, moldy coolers, dusty cans/packages, faded/missing labels, poor lighting, foul odors, .dirty/unsanitary, ice crystals on frozen foods, expired/outdated foods. Nor did he check the “other” box or write anything in the corresponding blank space. In the comments section, he noted, “Fish cooler not used in morning.” In other words, as explained by USDA Agent Travis Deters at defendants’ sentencing hearing, it appears that the inspector observed an empty cooler, inquired as to why it was empty, and learned that it was a fish cooler that was not used at 9:06 in the morning. Shortly thereafter, the USDA authorized the store to accept food stamps and WIC benefits. That the store had a fish cooler that was not used in the mornings does not appear to have raised any red flags for the USDA.
Second, at sentencing, the government relied upon an anonymous hotline tip as evidence that defendants were engaged in WIC fraud in the fall of 2001. On September 4, 2001, an anonymous caller contacted a USDA hotline to report that the store had allowed “hot foods” and “pre-paid phone cards to be sold for food stamp benefits.” No further information was provided, This was approximately five months after the store was authorized to accept food stamp benefits. The USDA investigated. An inspector visited the store on September 10, 2001, and “did [an] inventory and brief interview” with Emad Karaein. The inspector returned on October 18, 2001, and “completed [an] interview in depth.” Ultimately, the inspector concluded that the hotline “complaint [was] from [a] competitor” of the store. The inspector noted that the store would be monitored but no further action would be taken at that time.
Finally, at sentencing, the government argued that Emad Karaein’s “unexplained wealth” somehow corroborated that he had defrauded the government in 2001. The basis of the government’s argument was that Emad Karaein took out á mortgage of approximately $142,000 when he bought the store but paid it off quickly, perhaps two to three months later. But this “unexplained wealth” is of limited probative value as it relates to whether defendants allowed customers to illegally exchange ineligible items for food stamps or WIC benefits in 2001.[2] First, this evidence was *395 presented as to Emad Karaein, not Jawad Karaein.[3] (This means the only evidence against Jawad Karaein is á single, empty fish cooler and an uncorroborated anonymous tip dismissed by the USDA.) Second, Agent Deters did not offer any details. For instance, he did not explain how the mortgage was paid off or when it was paid (other than approximating it was two to three months later). He could not confirm or deny whether Emad Karaein paid off the mortgage with the help of a loan from his brother, Mustafa. Third, and more importantly, using the timeline presented by Agent Deters, the mortgage pay-off probably occurred before the store was authorized to accept food stamps or WIC benefits. Finally, even assuming that the payoff occurred after the store was authorized to accept benefits, a closer look at the record reveals that the store redeemed only negligible amounts in 2001 (e.g., $170.99 in May 2001, $618.27 in July 2001, $489.48 in August 2001, and $48.08 in September 2001). In other words, even assuming that Emad Karaein paid his mortgage in cash without a loan from his brother after the store was authorized to accept food stamps or WIC benefits, the government’s theory that these amounts enabled Emad Karaein to pay off a $142,000 loan is untenable.[4]
Resting on this evidence, the government argued to the district court that it should calculate the amount of loss from 2001 to 2010, as opposed to 2006 to 2010. Based on “the totality of the circumstances,” and Attachment D to the government’s sentencing memorandum, the district court ruled that calculating the amount of loss beginning in 2001 was “justified.” However, Attachment D was a spreadsheet comparing by month Middle Eastern Market’s benefits redemptions from May 2001 to June 2010 with the store’s post-search warrant monthly redemption average ($5,799.31) under new management in 2011. In the final column, Attachment D estimates each month’s fraud by subtracting the post-search warrant redemption average ($5,799,31) from Middle Eastern Market’s monthly redemp-tions. Thus, the spreadsheet is a rough estimate of fraud for each month that Middle Eastern Market redeemed food stamps or WIC benefits, not proof that fraudulent redemptions began at a certain time. When the district court mentioned Attachment D as justification for calculating the amount of loss from 2001, the government asked for clarification, referring to Attachment D as “just [] a back stop and a second check on [the evidence presented by the government].,” The district court clarified: “Right, for me it is part of the totality of the circumstances which convinces [me] that going back to 2001 is supported; that Agent Deters’s calculation based on 2001 is supported by the totality of the evidence available.” But Attachment D is not probative of whether the fraud began in 2001 or 2006. Neither the government nor Agent Deters suggested that Attachment D provided a basis from which to decide the fraudulent activity started in 2001. It was not offered for that purpose. It is merely a comparison by month of the store’s benefits redemptions with a 2011 *396 post-search warrant average for purposes of totaling the amount of loss. Accordingly, the district court’s reliance on it to prove that defendants engaged in -fraud in 2001 was misplaced. Furthermore, that the defendants do not challenge on appeal the post-search warrant method for calculating loss does not change the fact that Attachment D is not probative of whether defendants engaged in fraud between 2001 and 2005.
What remains is an explicably empty fish cooler, an uncorroborated hotline tip that the government investigated and dismissed as made by a “competitor,” and—in the case of only one of the defendants— Emad Karaein’s mortgage pay-off that occurred before the store was authorized to accept benefits or shortly thereafter. This evidence falls conspicuously short of establishing by a preponderance of the evidence that defendants had engaged in fraud starting in 2001.
At sentencing, a court “may not attribute a loss to a defendant based on mere speculation.” United States v. Comer, 93 F.3d 1271, 1285 (6th Cir. 1996). Ultimately, I am left with the “definite and firm conviction that a mistake has been committed,” id. (quoting United States v. Moreno, 933 F.2d 362, 374 (6th Cir. 1991)). I would vacate defendants’ sentences and remand for resentencing.

. The parties argued this issue at Emad Karachi's sentencing hearing. At ■ Jawad Ka-raein’s later sentencing hearing, the parties adopted the evidence and objections presented at Emad Karaein's sentencing hearing.

. Emad Karaein does not challenge the portion of the loss amount related to his personal use of benefits for his family ($113,617).

. It appears from the limited evidence put on the record with respect to Emad Karaein’s "unexplained wealth” that Emad Karaein, not Jawad Karaein, was the only person on the mortgage.

. Agent Deters also briefly mentioned, without detail, that Emad Karaein sent or took cash to someone in the country of Jordan in 2003. For the same reasons, this argument carries no weight with respect to store-related fraud. As to Emad Karaein’s personal use of benefits ($113,617), as noted above, he does not challenge that portion of the amount of loss on appeal.