NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0101n.06

No. 13-1123

UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Feb 06, 2014
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

RICHARD ALAN BEHNAN,

      Defendant-Appellant.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

BEFORE:    CLAY and DONALD, Circuit Judges; MAYS, District Judge.[*]

    **CLAY, Circuit Judge**. Defendant Richard Behnan appeals from the 55-month sentence and $1,624,089.66 order of restitution that the district court imposed following Defendant's guilty plea to one count of conspiracy to commit healthcare fraud in violation of 18 U.S.C. §§ 1347 and 1349. Specifically, Defendant contends that the district court erred in calculating the amount of loss caused by Defendant's crime, which affects Defendant's Guidelines sentencing range and the order of restitution. For the reasons set forth below, we **AFFIRM**.

## BACKGROUND

### I.    DEFENDANT'S FRAUD AND THE GOVERNMENT'S INVESTIGATION

    From 1985 to 2010, Defendant ran his own podiatry practice. Defendant had a somewhat unique client base—he almost exclusively treated geriatric and mentally disabled patients. The principal service he provided was trimming and polishing his patient's toenails. Medicare does

---

[*]The Honorable Samuel H. Mays, Jr., United States District Judge for the Western District of Tennessee, sitting by designation.

not compensate doctors for performing "routine foot care (including the cutting or removal of corns or calluses, the trimming of nails, and other routine hygienic care)." 42 U.S.C. § 1395y(a)(13)(C). However, Medicare and other insurance companies do reimburse doctors for removing ingrown toenails using a procedure known as a nail avulsion. The relevant insurance billing code defines a nail avulsion as "the separation and removal of a border of or the entire nail from the nail bed to the eponychium . . . performed using an injectable anesthesia except in the instances in which a patient is devoid of sensation or there are extenuating circumstances in which injectable anesthesia is not required or medically contraindicated." (R.63, 11/28/2012 Order, at 561.) In layman's terms, the doctor must remove a portion of an ingrown nail, from the tip of the toe back to where the nail grows (the eponychium). Trimming or clipping the toenail without going back to the eponychium constitutes routine foot care under the relevant billing codes.

Defendant's clientele was prone to ingrown toenails, given their sedentary lifestyle. Even so, Defendant billed for nail avulsions at an astonishing rate—over 37,000 times between 2000 and 2010. This figure accounted for approximately 80% of Defendant's bills to insurance providers. Other podiatrists in Michigan billed this procedure only 10–20% of the time. Medicare paid the vast majority of Defendant's bills for nail avulsions, to the tune of over $1.4 million. Blue Cross Blue Shield of Michigan ("Blue Cross") paid the remainder, approximately $200,000.

At some point in the mid-2000s, the government began investigating Defendant's billing practices, suspecting that Defendant was seeking compensation for nail avulsions he never performed. As part of the investigation, two agents who did not need nail avulsions saw Defendant and had their toenails trimmed. Even though he did not perform nail avulsions on the

agents, Defendant billed Blue Cross for phantom procedures. The government's investigation also uncovered four instances where Defendant billed for nail avulsions despite the fact that he was traveling in Europe at the time.

In June 2008, the government executed a search warrant at the home of Kelly Morel, Defendant's assistant in business and partner in crime. Morel had worked for Defendant since the 1980s, initially assisting him in treating patients, and later moving on to handling billing and cutting patients' nails. Defendant paid Morel $600 per month for her billing work, plus 20% of the take from insurance. When the government executed the search warrant, Morel gave a statement to one of the agents about her and Defendant's billing for nail avulsions. Morel told the agent that

> about 95% of avulsion codes billed are not being done correctly. I do work with [Defendant] and most of the time an injection to numb the area for avulsions . . . [is] not used. Sometimes a topical spray is used but not that often. . . . We trimmed patients' toenails and would bill for an avulsion. . . . [A] patient would come in and I would trim their nails and clean out the edges of their nails and it would always feel better but I know it should have been billed as routine foot care.

(R. 85, Morel Statement, at 983–84.)

## II.    PROSECUTION, SENTENCING, AND LOSS CALCULATION

Two years after the government took Morel's statement, she and Defendant were indicted for conspiracy to commit healthcare fraud and numerous discrete acts of healthcare fraud. Morel went to trial, but pleaded guilty to all counts halfway through. Defendant cut a deal with the government and pleaded guilty only to the conspiracy count. In his plea agreement, Defendant admitted to twelve instances when he billed for nail avulsions that he did not perform.[1] Defendant received just under $900 for these bogus procedures. In addition, the government

---

[1]The plea agreement defined a nail avulsion as "a surgical procedure used to treat ingrown toenails wherein the nail, or portion of the nail, is removed or torn from the nail bed below." (R. 41, Plea Agreement, at 366.)

asked the district court to hold Defendant accountable for the $1.6 million he had received from Medicare and Blue Cross for nail avulsions during the course of the conspiracy. This loss figure was relevant both to the calculation of Defendant's Guidelines sentencing range, which is affected by the amount of loss caused by a defendant's fraud, and to the amount of restitution Defendant would need to pay to the victims of his crime. Defendant disputed the government's loss calculation and the district court held three days of hearings to resolve this issue.

Morel testified on the first day of Defendant's sentencing hearing. The government introduced her 2008 statement that Defendant improperly billed approximately 95% of the nail avulsion procedures he claimed to have performed. Morel reiterated this figure in her testimony. She stated that only 5–10% of the procedures that Defendant billed as nail avulsions involved the application of anesthetic and the removal of a nail from the nail plate (the flesh covered by the nail). Defense counsel questioned whether Morel had a good sense of what constituted a nail avulsion. She testified "that [she] was taught that they were to cut down the side and take the curette[2] back to the eponychium and bring them up," but that from the expert testimony at her trial, she now believed that any procedure performed without anesthesia could not be a nail avulsion. (R. 61, Sentencing Tr. vol. I, at 525.)

The district court remembered the testimony for Morel's trial slightly differently: "the nail avulsion procedure could be performed without anesthesia. . . . [I]t depends on the patient and the tolerance for pain." (*Id.* at 537.) Defendant's witness Dr. Mary Barna, a podiatrist, confirmed the court's position. Barna testified that a "nail avulsion is removing the nail plate from the nail bed, in any portion." (R. 64, Sentencing Tr. vol. II, at 653.) Barna herself

---

[2]A curette is a "spoon-shaped instrument for removing material from the wall of a cavity or other surface." Dorland's Illustrated Med. Dictionary 447 (32d ed. 2012).

preferred not to use anesthesia before performing a nail avulsion, since administering the anesthesia could cause more pain and complications than the nail avulsion itself.

In addition to Morel, the government presented evidence of a less-than-rigorous survey of Defendant's patients to support its theory of loss calculation. Charles Story, an FBI agent, testified that an investigator had randomly selected fifty patients who had purportedly received nail avulsions, according to Defendant's billing history. Of the fifty, agents only managed to speak to approximately twenty. Story personally interviewed eight of these patients, and none of them reported receiving a nail avulsion. Paul Smith, an agent in the Department of Health and Human Services, also testified about this sampling. He interviewed some of the selected patients and none reported receiving nail avulsions. One patient reported having pain in her big toe, but Smith did not determine if the pain was caused by an ingrown nail. Another patient told Smith that Defendant had removed an ingrown portion of one of her nails, but had not removed the nail "back to where the bottom of the nail meets the skin." (*Id.* at 617.) The government did not assert that the sampling and interviewing of these patients provided any statistical basis for extrapolating a loss figure.

As a final piece of evidence, Defendant submitted an affidavit in which he estimated that he inappropriately billed nail avulsions just 2–3% of the time. Defendant did not testify at the sentencing hearing, so neither the district court nor the government had the opportunity to scrutinize this evidence.

In the end, the district court credited Morel's estimation that 95% of Defendant's nail avulsion billings were fraudulent and rejected the calculation in Defendant's affidavit. The court believed that Morel would have more incentive to give a lower loss figure than a higher one. Ultimately,

there is no evidence that's been tendered that would suggest that the government has gotten their numbers wrong and that we should disregard Miss Morel's testimony. . . . There is no reason to dispute the estimates that have been tendered by the government. I do not find the evidence having been sufficiently—any evidence, to contradict that other than [Defendant's] affidavit and I don't find the testimony in the context of that affidavit accurate or truthful.

(R. 83, Sentencing Tr. vol. III, at 933–34.) The court therefore adopted the government's loss calculation of $1,624,089.66, which, updated through November 2011, came to $1,766,869.15. This loss amount translated into a 16-point increase to Defendant's base offense level of 6. *See* U.S.S.G. § 2B1.1(a), (b)(1)(I). With four points added for Defendant's role in the conspiracy, and two removed for acceptance of responsibility, Defendant's total offense level was 24. Since Defendant's Criminal History Category was I, Defendant's Guidelines sentence range was 51–61 months. The court imposed a sentence of 55 months' imprisonment, and ordered restitution totaling $1,624,089.66, with $1.4 million going to Medicare and almost $200,000 going to Blue Cross. Defendant timely appealed.

## DISCUSSION

Defendant appeals the district court's loss calculation as it affected his Guidelines sentencing range and the amount of restitution the district court imposed. We address each claim in turn.

### I. GUIDELINES LOSS CALCULATION

We review a district court's sentence for procedural and substantive reasonableness for abuse of discretion. *See Gall v. United States*, 552 U.S. 38, 51 (2007). The review of procedural reasonableness includes evaluating whether the district court properly calculated a defendant's Guidelines sentencing range. *See id.* "We review the district court's calculation of the 'amount of loss' for clear error, but consider the methodology behind it de novo." *United States v. Washington*, 715 F.3d 975, 984 (6th Cir. 2013).

Under U.S.S.G. § 2B1.1(b)(1), a defendant's Guidelines offense level increases based on the amount of loss caused by his crime. The government bears the burden of proving the amount of loss by a preponderance of the evidence. *See United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011). The Guidelines advise that the district court "need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1 application note 3(C). In other words, the district court "does not have to establish the value of the loss with precision; it simply needs to publish the resolution of contested factual matters that formed the basis of the calculation." *United States v. Poulsen*, 655 F.3d 492, 513 (6th Cir. 2011) (quotation marks omitted).

The district court's loss calculation rested almost entirely on Morel's testimony that 95% of Defendant's billings for nail avulsions were fraudulent. The court explicitly found Morel credible, since each cent she added to Defendant's loss amount applied equally to her own Guidelines calculation. "This conclusion is basically unassailable on appeal." *United States v. Greco*, 734 F.3d 441, 446 (6th Cir. 2013) (quotation marks omitted). But Defendant does not challenge the court's credibility determination per se—he asserts that Morel's sincere statements lacked a proper foundation. Morel's 95% estimate applied to over 37,000 procedures that Defendant billed over the course of a decade. Defendant argues that Morel could not have seen or recollected this vast number of procedures over such a long amount of time. The Guidelines, however, do not call for mathematical exactitude—they allow a district court to make a "reasonable estimate of the loss." U.S.S.G. § 2B1.1 application note 3(C). Morel worked closely with Defendant throughout the conspiracy, handling his billing and assisting him when

he worked on patients. She more than anyone was competent to testify to how Defendant's bills matched up with the procedures he performed.

Defendant also claims that Morel cannot make a reasonable estimate since she has no idea what a nail avulsion is. At the sentencing hearing, Morel testified that Defendant only used anesthesia in 5–10% of procedures that he billed as nail avulsions. Morel further testified that she believed that anesthesia was required for the removal of an ingrown toenail to constitute a nail avulsion. The testimony of Dr. Barna (and the court's own recollection of the testimony at Morel's trial) established that nail avulsions do not always require anesthesia. But Morel's 95% estimate remained consistent before and after her trial—when she heard the testimony that made her question the definition of a nail avulsion. When Morel first gave this estimate in 2008, she stated that "[t]he 11730 [the nail avulsion billing code] we did not do correctly. We trimmed patients' toenails and would bill for an avulsion." (Morel Statement at 984.) With or without anesthesia, simple nail trimming is not a nail avulsion.

Morel's estimate was also bolstered by the other evidence the government submitted. The undercover agents who were treated by Defendant did not receive nail avulsions, nor did the few patients the government interviewed. Defendant billed Medicare and Blue Cross for nail avulsions nonetheless. This independent data compares favorably to Morel's 95% estimate. The government's investigation would not likely support a rigorous statistical analysis of Defendant's 37,000 billings for nail avulsions. But "[t]here is no rule that a district court must rely upon statistical analysis in a situation such as this to determine the amount of loss pursuant to section 2B1.1." *Jones*, 641 F.3d at 712. The district court was entitled to rely on the government's data as support for Morel's 95% estimate. *See Greco*, 734 F.3d at 446–47; *United States v. Goosby*, 523 F.3d 632, 639–40 (6th Cir. 2008).

A district court faces an imposing task when asked to calculate the amount of loss for a decade-long fraudulent scheme such as Defendant's. But the district court ultimately need only make a reasonable estimate of the loss. We will not disturb that finding unless the court's "evaluation of the loss was not only inaccurate, but outside the realm of permissible calculations." *United States v. Gray*, 521 F.3d 514, 543 (6th Cir. 2008) (quotation marks omitted). The district court was entitled to rely on Morel's honest estimate. In fact, the district court could have simply relied on the "aggregate dollar amount of fraudulent bills submitted to" Medicare, which "shall constitute prima facie evidence of the amount of the intended loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted." U.S.S.G. § 2B1.1 application note 3(F)(viii). We cannot say that the loss amount the court reached after three days of hearings was clear error. *See United States v. Sufi*, 455 F. App'x 672, 676–77 (6th Cir. 2012).

Finally, Defendant argues that the district court erred when it failed to account for the amount Defendant could have received had he billed his procedures legitimately. The only evidence Defendant produced to support this position was his own affidavit. Defendant refused to testify, and therefore this evidence was not subjected to cross-examination. The district court could have relied on this evidence, *see United States v. Graham-Wright*, 715 F.3d 598, 601 (6th Cir. 2013), but its choice not to does not rise to the level of clear error. Defendant bore the burden of proving the amount of any offset to his loss amount by a preponderance of the evidence. *See Washington*, 715 F.3d at 984–85; *see also United States v. Mahmud*, --- F. App'x ----, 2013 WL 5925992, at *5 (6th Cir. Nov. 6, 2013). The district court did not err in finding that Defendant had not met this burden.

**II.     RESTITUTION CALCULATION**

Defendant next asserts that the district court's calculation of the amount of restitution was error.   The Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A, applies to convictions for conspiracy to commit healthcare fraud.  *See United States v. Hunt*, 521 F.3d 636, 639, 648 (6th Cir. 2008).  As with loss under the Guidelines, the government bears the burden of proving "the amount of the loss sustained by a victim as a result of the offense," 18 U.S.C. § 3664(e), by a preponderance of the evidence.  *See United States v. White*, 492 F.3d 380, 418 (6th Cir. 2007).  This Court "review[s] the amount of restitution the district court ordered for abuse of discretion."  *United States v. Bogart*, 576 F.3d 565, 573 (6th Cir. 2009).

Defendant argues that the district court's order of restitution was error "for precisely the same reasons that the government's proofs fell short when it came to establishing an amount of loss" for Guidelines purposes.  (Appellant's Br. at 18.)  Since we affirm the district court's loss calculation as it affected Defendant's Guidelines sentencing range, we further hold that the district court did not abuse its discretion in using the same reasoning to calculate the amount of Defendant's restitution.

## CONCLUSION

For the reasons set forth above, we hold that the district court did not err in calculating the amount of Defendant's loss under U.S.S.G. § 2B1.1, nor did the court abuse its discretion in calculating the amount Defendant was ordered to pay in restitution.  We therefore **AFFIRM** the district court in full.