NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0101n.06

Nos. 17-2209/2401

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 01, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| ELAINE LOVETT, (17-2209); JOHNNY | ) | MICHIGAN |
| TROTTER, II (17-2401), | ) | |
| | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE:     GIBBONS, ROGERS, and STRANCH, Circuit Judges.

ROGERS, Circuit Judge. Johnny Trotter, a medical doctor, and Elaine Lovett were convicted of conspiracy to commit health care fraud. Under the conspiracy, Trotter billed for services that were never performed at his various clinics, and Lovett, cofounder of a medical billing services company, helped with billing and registered new entities to avoid review by Medicare. On appeal, the defendants raise various evidentiary objections and also argue that the district court massively miscalculated the loss they caused to Medicare, resulting in an unreasonable sentence. None of the contested evidence was improperly admitted, nor improperly relied upon by the district court at sentencing, and the court's loss calculation was reasonable.

I.

In 2007, Trotter came home to Detroit to work in his father's family medical practice. Among other things, Trotter provided pain treatments to his patients. According to Trotter, he

wanted to help reduce the use of narcotics, and so he would provide alternative pain treatments, including the injection of dexamethasone and lidocaine very close to the nerves in a painful area. Trotter referred to this procedure as a "nerve block." He testified that a nerve block is more than just an ordinary shot; it is an involved procedure that carries a high level of risk. As Trotter explained, if the person administering the nerve block is not precise, "you can actually paralyze that patient for that nerve. You can cause pain that will last forever." According to Trotter, multiple nerve blocks can be administered to different parts of a patient's body on the same day, e.g., different sides of the body, and the same nerve block can be administered to the same part of the body as frequently as every two weeks.

After Trotter's father passed away in February 2008, Trotter continued to work at his father's clinic, but he also began opening more clinics and registering them as Medicare providers. Medicare providers have to register and apply for a provider number to put on their claims. They have to provide their identity, practice location(s), and information relating to ownership and control of the provider organization (e.g., who owns the clinic). Medicare receives millions of claims per year, and operates as a "trust-based" system: if a claim form is complete, the claim is paid automatically. If administrators suspect an issue with a provider, they can place the provider on "prepayment review," which means Medicare will stop the automatic payment of claims and instead review the documentation (e.g., patient records) prior to paying the claim.

Trotter registered John R. Trotter II, M.D., Medical Services, PLLC ("Trotter Medical Services") as a Medicare Provider, as well as Grace Family Health Center and Southfield Family Practice. He used ABIX as his Medicare billing agency for all these entities. Cofounded by Elaine Lovett and Michelle Freeman, ABIX provided medical billing services. Freeman handled the credentialing (enrolling providers in Medicare) and Lovett handled the billing.

Because Trotter was billing for a "high volume of nerve block injections," a Medicare contractor tasked with investigating fraud took notice. Trotter Medical Services, Grace, and Southland were all placed on prepayment review beginning in March 2009. It is not illegal to perform a high volume of nerve blocks, and a provider may still receive compensation for providing nerve blocks after being placed on prepayment review. Placing these entities on prepayment review meant only that Trotter needed to provide documentation to prove that he was actually providing medically necessary services before he received compensation. Trotter submitted documentation for claims billed under Trotter Medical Services, Grace, and Southfield after these entities were placed on prepayment review. These claims were largely nerve block claims, and they were all denied.[1] There were various problems with these claims. For example, Trotter and Lovett submitted claims for 96 nerve blocks for a single patient in 2008. *See* Tr. Transc., R. 161 at PageID 2826. These included three days on which the patient supposedly received 18 nerve blocks in a single day. *Id.*

After Trotter Medical Services, Grace, and Southland were placed on prepayment review, Trotter purchased or incorporated a number of entities, including several companies that included the name "Administrative Management Solutions," such as "Comprehensive Administrative Management Solutions," or "Delta Administrative Management Solutions." These "AMS entities" raised eyebrows. They were incorporated, and enrolled in Medicare, within one month of each other. Their mailing addresses were post office boxes in the same town, and they all had cellphone numbers as their phone numbers rather than landline numbers. The owners listed on the Medicare enrollment paperwork were not doctors or clinicians—Trotter was not listed on any of

---

[1] At oral argument, Trotter's counsel stated that Medicare never reviewed these claims. Trotter did not object at trial when the Government elicited testimony that they were denied, and it is undisputed that the claims were never approved.

the enrollment paperwork. The owner of Delta AMS, for example, was 21 years old when she registered the company. All of these AMS entities "were billing the same sort of set of codes, includ[ing] nerve block injections . . . and [vitamin] B12 injections." One of the AMS entities, Total AMS, was placed on prepayment review, but failed to submit any documentary evidence of the claims it had submitted, and so those claims were denied.

After discovering these irregularities and tying the AMS entities to Trotter, Medicare investigators uncovered several other apparently fraudulent clinics. In all, investigators discovered thirteen entities linked to Trotter after Trotter Medical Services, Grace, and Southland were put on prepayment review, and all of these entities billed for high rates of similar services, such as nerve blocks. These entities all used ABIX for billing services.

The Government ultimately indicted Trotter and Lovett on charges of health care fraud. According to the Government, Trotter and Lovett had engaged in a two-phase conspiracy. In phase one, Trotter and Lovett had billed for a high volume of fraudulent claims, mostly for nerve blocks that were never administered. After Trotter and Lovett drew the attention of Medicare investigators, they moved to phase two, creating sham companies like the AMS entities to avoid prepayment review by Medicare. The indictment charged both defendants with one count of conspiracy to commit health care fraud and three counts of health care fraud. The jury ultimately found Trotter and Lovett guilty.[2] The district court denied both defendants' motions for judgment of acquittal and for a new trial, and proceeded to sentencing.

The primary issue at sentencing was the loss calculation. Under § 2B1.1 of the Sentencing Guidelines, the district court must make a calculation of the actual or intended loss, whichever is greater, and apply the corresponding enhancement; the more the loss, the higher the offense levels.

---

[2] Trotter was also charged with one count of money laundering, on which he was acquitted.

The presentence investigation report calculated the loss amount at $25,992,567, the entire amount billed by ABIX for claims by Trotter's companies. Both defendants objected to that amount. They argued that the loss was limited to the amount charged in the indictment for the three specific health care fraud counts, which amounted to $3,630. The district court ultimately found the loss amount to be less than $25 million, but more than $20 million. The district court concluded that a number over $25 million "would be difficult to substantiate based on the testimony . . . at trial." The court admitted there was "some legitimate treatment" provided by these entities, but stated that "most of these entities were established to perpetrate the fraud on Medicare to avoid prepayment review." The district court rejected defendants' arguments that the loss should be confined to the $3,630 outlined in the health care fraud counts. Based on its loss calculation, the district court applied a 20-point increase to the offense level. The district court issued below-guidelines sentences of 180 months' imprisonment for Trotter and 120 months' imprisonment for Lovett. Trotter and Lovett now appeal their convictions and sentences.

II.

Trotter and Lovett make three arguments to challenge their convictions: two evidentiary arguments, and a third claim that Lovett's counsel was denied a chance to respond to arguments made by the Government in the rebuttal portion of the closing argument. These arguments lack merit.

A.

First, defendants contend that it was improper for the jury to hear from a Dr. Cherie Hawkins, who had worked in Trotter's clinics, and that it was improper for the Government to introduce spreadsheet data that summarized the types of claims for which Trotter's clinics had billed. Hawkins worked for Trotter and testified at trial that she did not perform "nerve blocks,"

but that many nerve blocks were billed in her name. Hawkins testified that she never gave a "nerve block" to anyone. She testified that "to [her] understanding," a "nerve block" was a procedure that "has to be done under fluoroscopy ultrasound guidance because of the nature of the injection itself." Echoing Trotter's explanation of a nerve block, Hawkins testified that "[i]f you hit a nerve or hit the wrong area, you can cause some severe damage." Neither Trotter nor Lovett objected to this testimony. Later, as Dr. Hawkins continued to testify about what she believed the nerve block procedure required—such as the amount of patient preparation—Trotter's counsel objected, and the following exchange ensued:

> **Mr. Rataj** [Counsel for Trotter]: Well, your Honor, I object now because first, she said she doesn't know anything about nerve blocks, and now she is giving all of this expert type of testimony.
> **[Prosecutor]**: Your Honor, if Mr. Rataj has an objection, he can state it.
> **Mr. Rataj**: Lack of foundation, your Honor [. . .]
> **The Court**: Speaking objections are generally not favored. The Court will overrule the objection.
> **Mr. Rataj**: Thank you, your Honor.

The prosecutor then continued questioning Hawkins.

Hawkins testified about how she learned that services she never performed were billed in her name. According to Hawkins, one of Trotter's patients, Ursula Kruzman, showed Hawkins an Explanation of Benefits form ("EOB") detailing chiropractic and ultrasound services Hawkins had performed at St. Joseph Medical Center; but Hawkins had never worked at St. Joseph Medical Center, has never provided chiropractic services to anyone (she is not a chiropractor), and had never provided ultrasound services to Ms. Kruzman. Hawkins testified that after reporting these problems to Lovett, Lovett responded by asking if Hawkins had reported Trotter to Medicare. Hawkins testified that when she told Trotter, he responded, cryptically, "just because you don't know, doesn't mean you're not guilty."

Although Hawkins testified that she never performed any "nerve blocks," she admitted, on both direct and cross-examination, that she regularly gave patients shots for pain problems. For example, Dr. Hawkins testified that she "administered B12 shots and topical injections. If it was a pain issue, if they had shoulder pain, knee pain, but mostly topical." Tr. Transc., R. 158 at PageID 2491. These included shots of lidocaine and dexamethasone. Hawkins testified that she gave "eight to ten" dexamethasone and lidocaine shots per patient per week.

The defendants do not demonstrate that Hawkins should not have been permitted to testify. The essence of defendants' complaint about Hawkins' testimony is the contention that Hawkins was wrong about what a "nerve block" entailed, and yet the Government relied on Hawkins' testimony to prove that Trotter had fraudulently billed for thousands of "nerve blocks." Trotter argues that "[t]here is no doubt" that Hawkins' testimony was improper, because "the inexperienced Dr. Hawkins gave a definition of nerve block that was both wrong and misleading." Trotter App. Br. at 40. That is not an evidentiary objection. Neither defendant argues on appeal that, for example, Dr. Hawkins' testimony was improper expert testimony, unduly prejudicial, or irrelevant. The Government reasonably understands Trotter's position as "not even argu[ing] on appeal that Hawkins's testimony was inadmissible." Gov't Br. at 47. Instead, Trotter and Lovett simply disagree with Hawkins' "understanding" of what a nerve block was, and disagree with the Government's argument that they billed for thousands of nerve blocks that were never performed. But the jury, after hearing Trotter and Lovett make their arguments, agreed with Hawkins and the Government. Trotter dedicates much of his briefing to arguing fact issues, asserting that various patients actually received the nerve blocks for which they were billed. This is simply a factual issue that the jury resolved against him and not a basis for relief.

Moreover, even if the district court had erred by admitting Hawkins' testimony, that error would have been harmless in light of the overwhelming weight of the evidence. The defendants overstate the force and importance of Hawkins' testimony. Hearing it from the defendants, the Government's case was founded on the idea, supported by Hawkins' testimony, that every nerve block is a complicated procedure requiring fluoroscopy, whereas defendants were charging instead for simpler "pain blocks" not requiring fluoroscopy. The district court aptly characterized Trotter's theory of the case as "something of an alternate reality." The Government did rely in part on Hawkins' testimony, but the Government also relied on, among other things, the testimony of Medicare claims investigators, testimony about ABIX's fraudulent billing practices, testimony from patients,[3] and Hawkins' testimony that had nothing to do with nerve blocks.

The defendants also object to the admission of various spreadsheets, but again fail to make a cognizable evidentiary objection. At trial, the defendants objected to a number of spreadsheets that summarized claims submitted by various Trotter entities. For example, they objected to Government Exhibit 100, which listed all claims submitted by Grace. Neither defendant disputed the veracity of these charts. Rather, they argued that the spreadsheets were irrelevant. Counsel for Lovett argued that because the Government was only going to call four patients to testify about the services they received, it would be improper to submit data on the thousands of other patients for whom claims were submitted by these entities. Essentially, the defendants took issue with the inferences they believed the Government would ask the jury to make. The defendants argued that

---

[3] For example, the force of Ursula Kruzman's testimony had little to do with Hawkins' testimony regarding the nerve block procedure. Kruzman testified that she never received any services from Hawkins or a Dr. Crawford and yet thousands of dollars of services supposedly provided to her by these doctors were billed to Medicare. She did not testify that she got quick, painless shots from Crawford but was billed for "nerve blocks." She testified that no shots at all were performed on the dates charged in the indictment, or the date in her paperwork where Crawford purportedly performed seven nerve block injections. The jury could have completely endorsed Trotter's definition of a nerve block, and completely rejected Hawkins', and still have found that Kruzman never received nerve blocks that were billed in her name.

the Government was going to offer some proof that a few patients had been billed for services they never received, and then ask the jury to infer that every claim in these exhibits was fraudulent. The district court overruled their objection, explaining that "it seem[ed] . . . that . . . many of the objections from the defense go to the weight and not the admissibility of these records."

On appeal, the defendants raise arguments made below that, as the district court correctly concluded, go to the weight and not the admissibility of this evidence. Defendants contend that it was too tenuous to argue that all the billed nerve blocks on these spreadsheets were fraudulent based on the testimony of a doctor and a few patients that some nerve blocks were fraudulent. It is true that the Government's proof directly addressed only a handful of the claims summarized in these spreadsheets. There may be cases in which such limited evidence is not sufficient to establish liability for a much broader universe of claims, and expert testimony or statistical analysis may be necessary to demonstrate liability. But here, the Government's case rested in part on the fact that the defendants engaged in a pervasive conspiracy to submit claims for services that were never provided and for which proper documentation never existed. Further, the defendants were free to argue at trial (and did argue) that the Government's limited evidence was not enough to show that they engaged in a much broader conspiracy. The jury rejected that argument and, relying on evidence of the defendants' pervasive fraud, reasonably decided that enough of these claims were fraudulent to support a verdict for the Government on the conspiracy count.

B.

Second, Lovett argues that the testimony of Beth Jenkins, a health care professional with whom Lovett had worked in 2008, was improper other-act evidence, such that its admission warrants a new trial. The evidence was, however, properly admitted.

Jenkins, an owner of an adult day care center, testified about her interaction with Lovett. She testified that in 2008, around the time Lovett and Trotter were beginning to work together, Lovett suggested a way for Jenkins to avoid some trouble with Medicare. Medicare sent Jenkins notice that it would cease paying her claims, and, according to Jenkins, Lovett suggested that Jenkins "change the company name under a new ownership, and then continue to do business." In other words, according to Jenkins, Lovett suggested that Jenkins should engage in behavior very similar to the behavior alleged as "phase two" of the Lovett-Trotter conspiracy. Lovett objected to Jenkins' testimony, arguing that it was improper "other acts" evidence barred by Federal Rule of Evidence 404(b)(1). The district court overruled Lovett's objection in a written opinion. The district court reasoned that the actions Jenkins was going to testify to were so similar and so close in time to the alleged conspiracy, that this testimony would be relevant for the permissible purpose of proving intent "and, if necessary," knowledge.

Jenkins' testimony was permissible evidence of intent and knowledge and was not unduly prejudicial. Lovett's intent and knowledge were at issue here. Lovett was charged with the specific intent crime of conspiracy, and she argued a lack of knowledge of the scheme as a defense. Lovett's suggestion that Jenkins create new companies to avoid Medicare review strongly suggests that when Lovett helped Trotter set up new companies her intended purpose was to avoid Medicare review. In its preliminary ruling admitting the evidence, the court wrote that "Lovett may argue that she relied on others to ensure the integrity of the claims and therefore did not know that they were fraudulent. Jenkins' proposed testimony rebuts this argument." As predicted, Lovett did in fact make this argument. The Government properly used Jenkins' other-act testimony to prove intent and knowledge. *See United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994); *accord United States v. Carter*, 779 F.3d 623, 625 (6th Cir. 2015); *United States v. Avalos*, 458 F. App'x

530, 533 (6th Cir. 2012). Evidence of other acts may be admissible as proof of intent or knowledge when intent and knowledge are at issue in the trial. Fed. R. Evid. 404(b); *United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996).

Moreover, the district court correctly determined that this testimony was more probative than prejudicial because "[w]hether Lovett defrauded Medicare innocently or intentionally is a central issue of this case," and the possibility that the jury would rely on the evidence as propensity evidence could be mitigated by instruction. Op. and Order Regarding Gov't's Notices of Intent to Offer 404(b) Evidence at 9 (internal quotation marks and alterations omitted).

Lovett argues that the district court failed to explain why and for what purposes it admitted the evidence, but the district court properly set forth its reasons. The district court clearly explained the purposes for which the evidence was to be admitted, reading the Government's argument as focusing on intent and knowledge and analyzing why the testimony would be useful for such purposes. The district court explained:

> Other acts evidence is only admissible if it is offered to prove something other than character. Fed. R. Evid. 404(b). The Government argues that the evidence of Lovett's alleged scheme with Jenkins should be admitted to prove intent and, if necessary as a defense, knowledge [. . . .]
>
> Lovett's alleged scheme with Jenkins is substantially similar to all four counts in the indictment. In the other act at issue, Lovett allegedly billed Medicare for services that Jenkins did not provide and for companies credentialed in the name of a straw owner. In the indictment, Lovett is charged with conspiring and executing a scheme to defraud Medicare by submitting false claims for services that were not rendered, and were medically unnecessary, while knowing them to be false. Both acts involve Lovett knowingly submitting false claims through companies designed to conceal ownership and management interests [. . . .]
>
> This evidence is also probative of Lovett's knowledge. Lovett may argue that she relied on others to ensure the integrity of the claims and therefore did not know that they were fraudulent. Jenkins' proposed testimony rebuts this argument, asserting that Lovett knew whether the services were actually provided and billed claims for unprovided services. Lovett may also argue that she had no knowledge of her co-defendant's straw ownerships. If a provider is flagged for review, they can continue

> to submit claims under another company, so long as they list a straw owner on the Medicare enrollment forms. Jenkins testimony reveals that Lovett billed Medicare claims for Procare and 2nd to None despite knowledge of Freeman's advice and why straw owners were used. This evidence speaks to Lovett's knowledge of fraudulent billing and failure to disclose Trotter's ownership interests.

Op. and Order Regarding Gov't's Notices of Intent to Offer 404(b) Evidence at 7-9.

*Merriweather*, a case cited by Lovett, is different from this case.  In *Merriweather*, the district court did not properly explain its decision to admit the other acts evidence and on appeal this court explained that jurors could not "have had the vaguest notion of the limited *proper* purpose for which they might have considered the evidence."  78 F.3d at 1076.  In contrast, the district court here properly explained the limited purposes of Jenkins' testimony in its order and in its instructions to the jury.

Lovett further argues that there were other problems with Jenkins' testimony, but these arguments are misguided.  She contends that Jenkins' prior statements contradicted what she said on the stand; Jenkins had earlier said Freeman (Lovett's ABIX co-founder) was the one who provided the idea to switch Medicare provider identities.  Lovett also argues that Jenkins' testimony was not helpful to the Government, asserting that it only showed that "based upon her years of experience in the medical insurance field, Lovett has knowledge of what a provider can and cannot bill for."  But Jenkins' prior inconsistent statements do not affect the admissibility of her testimony, even if they could serve to impeach her (and Lovett did use this evidence to impeach Jenkins at trial).  Moreover, these arguments generally serve to undermine Lovett's contention that Jenkins' testimony was highly prejudicial:  if Jenkins' testimony was incredible, harmless, or both, then it is hard to see how the jury would have been unduly prejudiced against Lovett as a result of hearing it.  Jenkins' testimony was properly admitted.

C.

Third, Lovett contends that her right to a fair trial was violated because the Government misrepresented evidence in its rebuttal argument and the district court denied her request for a surrebuttal. But the Government did not misrepresent the evidence or present any line of argument for the first time in its rebuttal that would have deprived Lovett of the chance to respond.

This issue revolves around the testimony of one of Lovett's employees, Bianca Johnson, regarding "cheat sheets." At trial, Johnson testified that Lovett instructed her to use "cheat sheets" when processing claims. In closing, Lovett's counsel attempted to impeach the credibility of Johnson by showing that she could not have used one of these "cheat sheets" admitted into evidence because if she had, the claims data would be different. To make his point, Lovett's counsel used one of the "cheat sheets" admitted into evidence, Government Exhibit 302, and explained "Mr. Foster [a prosecutor] was the one doing the direct examination of Ms. Johnson, and Mr. Foster used only Exhibit 302. So I'm going to stick to 302 because that's what she said, Government Exhibit 302."

The Government rebutted Lovett's argument by pointing to the possibility of Johnson's having used other "cheat sheets," not just Government Exhibit 302. Contrary to what Lovett's counsel argued, the prosecutor had in fact referred to several cheat sheets on direct examination. More to the point, the Government highlighted the "side show" nature of this exercise, arguing that the use of any particular "cheat sheet" for any particular claim was beside the point: the fact that there *were* any "cheat sheets" was the real problem for Lovett.

Lovett saw this counter-argument as the Government's misleading the jury. According to Lovett, the Government had improperly accused Lovett's counsel of hiding the ball from the jury and should have instead acknowledged that Lovett's counsel only used Exhibit 302 because

Lovett's counsel thought that was what the Government had used. Lovett requested the opportunity to give a brief surrebuttal to present the jury with this information.

The district court's denial of that request was not an abuse of discretion. The jurors were free to weigh the arguments against their own memory of the case—asking themselves whether the Government really did rely only on Government Exhibit 302 as Lovett's counsel contended, and whether it mattered. The district court could properly deny Lovett's counsel the opportunity to repeat something that he had already said in closing even though he believed the Government had mischaracterized his argument.

Accordingly, the defendants present no error that would warrant requiring a new trial.

D.

The defendants' sentencing arguments also lack merit. As defendants see it, the Government proved beyond a reasonable doubt only three discrete counts of health care fraud, thereby proving a loss to Medicare of only $3,360. But the Government argued at sentencing that every claim billed by Trotter-controlled entities, and submitted through ABIX, constituted a "loss" to Medicare, a sum of approximately $25.9 million. The district court determined that the Government's proposed calculation "would be difficult to substantiate based on the testimony . . . at trial" and instead calculated the loss at closer to $20 million. The defendants argue that the district court erred in calculating the loss as closer to the Government's $25.9 million figure than their own $3,360 figure, because the Government did not "prove" that the defendants billed Medicare anything close to $25 million in fraudulent claims.

This argument fails in the context of this case. The Government proved that the defendants engaged in a pervasive health care fraud conspiracy, and it submitted the entire amount billed during that conspiracy as the amount of loss. In cases where a defendant's fraud is not so far-

reaching and evidence is presented to distinguish legitimate claims from fraudulent ones, further explanation of the bases for the Government's loss calculation may be necessary; we do not address that situation here. Given the sweeping nature of the defendants' scheme to bill for services never rendered in this case, the Government's initial loss calculation here was reasonable. Under U.S.S.G. § 2B1.1 cmt 3(F)(viii) the guidelines state that "[i]n a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted." This court has approved of using the total amount billed to Medicare during a pervasive health care fraud scheme. In *United States v. Washington*, 715 F.3d 975 (6th Cir. 2013), we stated that "[the district court] would have been justified in finding the amount of loss to be the entire $3.32 million because it found that the entire wellness program was a sham." 715 F.3d at 984. In *United States v. Behnan*, 554 F. App'x 394 (6th Cir. 2014), this court similarly stated that "the district court could have simply relied on the aggregate dollar amount of fraudulent bills submitted to Medicare." 554 F. App'x at 400 (internal quotation marks omitted).

The defendants did not sufficiently rebut the Government's calculation. In *Washington*, we held that the defendant had the burden of proving a specific amount by which the Government's reasonable proffered loss calculation should be reduced. 715 F.3d at 985. The defendants here did not put forth any evidence showing a specific amount by which the Government's loss calculation should be reduced. As the Fifth Circuit has explained, "where the Government has shown that the fraud was so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant to make a showing

that particular amounts are legitimate." *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012). The defendants did not attempt to meet this burden.

Rather, they attempted to rebut the Government's loss calculation by arguing that the loss should be limited to the $3,360 set forth in the indictment under the individual health care fraud counts. This argument fails for two reasons. First, that is not the law. Loss is not limited to amounts alleged in the indictment and found by a jury beyond a reasonable doubt. *See United States v. Esway*, 488 F. App'x 969, 971 (6th Cir. 2012). The Government need only prove the loss to the court by a preponderance of the evidence. *Washington*, 715 F.3d at 984. Second, the district court did not abuse its discretion in deciding that a loss figure of between $20 and $25 million was more reasonable than a figure of $3,360. It may be too much to assume that every claim billed during the conspiracy was fraudulent, but that is not what the district court did. Instead, the court determined that some of the claims submitted were likely legitimate, but most were fraudulent, and calculated the damages accordingly. That was a reasonable decision.

Trotter argues that the district court was unreasonable because the court's calculation was even less rigorous than that of the district court in *United States v. Jones*, 641 F.3d 706 (6th Cir. 2011), which we found to be a clearly erroneous calculation. *See* 641 F.3d at 712-13. Trotter, however, misunderstands *Jones* and this case. In *Jones*, the district court adopted the Government's "statistical extrapolation" to arrive at its loss figure, and "provided no other explanation for how it reached that figure." 641 F.3d at 712. We found several problems with that "statistical extrapolation"—it was based on evidence not in the trial record, it ignored bills from fifty-four patient files that were "missing," and the district court was not aware those files were missing or not included in the statistical analysis. *Id.* We held that because the district court's

loss calculation was based solely on this flawed statistical analysis, its loss calculation was clearly erroneous. *Id.* at 713.

Trotter points to *Jones* as an example of this court's rejection of a loss calculation based on a sample of hundreds of patient files, and argues that the loss calculation here must be rejected because, according to Trotter, it was based on less: namely, the testimony of a single doctor and a few patients. The problem in *Jones*, however, was not that the statistical analysis did not cover enough patients. The problem was that it was a flawed analysis of the patients that it purported to cover. Moreover, the loss calculation here was not based just on the testimony of Hawkins and a few patients, nor was it based on any "statistical extrapolation" taken from that testimony. The loss calculation here was based on (1) the total amount of bills submitted during the conspiracy and (2) unrebutted evidence that most, but not all, of those claims were likely fraudulent. In short, the loss calculation in *Jones* was deficient in a way that is not applicable here.

The district court properly recognized that Trotter and Lovett likely did not defraud Medicare in every single claim they submitted. But a jury convicted both of engaging in a years-long fraud conspiracy, and none of the defendants' arguments on appeal warrants reconsideration of that conviction. At sentencing, the defendants did not meet their burden of showing which services billed during the conspiracy were actually rendered.

We affirm the judgment of the district court.